IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION


EOD
01/29/2014

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **DeLISA C. CRAVANAS** | § | Case No. 12-40004 |
| xxx-xx-7000 | § | |
| | § | |
| Debtor | § | Chapter 7 |
| VALIS HOUSTON | § | |
| | § | |
| Plaintiff | § | |
| | § | |
| v. | § | Adversary No. 12-4156 |
| | § | |
| DeLISA C. CRAVANAS | § | |
| | § | |
| Defendant | § | |

### **FINDINGS OF FACT AND CONCLUSIONS OF LAW[1]**

Upon trial of the complaint filed by the Plaintiff, Valis Houston ("Plaintiff"), seeking a determination of the dischargeability of a debt allegedly owed to him by the Defendant-Debtor, DeLisa C. Cravanas ("Defendant" or "Cravanas"), the Court issues the following findings of fact and conclusions of law. The Plaintiff contends that the debt owed to him is nondischargeable under the alternative grounds set forth in 11 U.S.C. §523(a)(2)(A), and (a)(4). After the trial, the Court took the matter under advisement. This decision disposes of all issues pending before the Court.

---

[1] These findings of fact and conclusions of law are not designated for publication and shall not considered as precedent, except under the respective doctrines of claim preclusion, issue preclusion, the law of the case or as to other applicable evidentiary doctrines.

# FINDINGS OF FACT

1.   On January 2, 2012, the Defendant filed a voluntary petition for relief under Chapter 13 of the Bankruptcy Code in this Court.

2.   Her case was voluntarily converted to Chapter 7 on August 3, 2012.

3.   Among the debts sought to be discharged by the Defendant is a debt evidenced by a default judgment entered against the Defendant by the County Court at Law #3 in and for Collin County, Texas in cause no. 003-1766-07 and styled *Valis Houston v. DeLisa Cravanas, The In Group, LLC, and Countrywide Home Loans, Inc.*, in which the Plaintiff was awarded, by default, treble damages in the amount of $19,230.81, plus pre-judgment interest, attorney's fees, and post-judgment interest (the "State Court Default Judgment").[2]

4.   On October 23, 2012, the Plaintiff filed his original complaint in this adversary proceeding, seeking a determination that the debt established by the State Court Default Judgment should be declared nondischargeable under 11 U.S.C. §523(a)(2)(A) or (a)(4).[3]

5.   The indebtedness reflected in the State Court Default Judgment arises from the involvement of the Defendant in certain post-closing construction activities that occurred at a property which the Plaintiff had acquired through financing provided by Countrywide Home Loans, Inc.

6.   The state court did not issue specific findings of fact in support of the State Court Default Judgment. It stated merely in its Default Judgment that the allegations of the petition had been admitted by the Defendant.

7.   The state court made no further factual recitation regarding the Defendant's behavior and, although it trebled the compensatory damage award, it offered no explanation for that action in the Judgment.[4]

---

[2] Ex. 20. The Plaintiff had non-suited Countrywide prior to the entry of the State Court Default Judgment.

[3] The allegations of the complaint under §523(a)(4) were based solely upon the Defendant's asserted status as a fiduciary. There was no allegation presented under the (a)(4) categories of embezzlement and/or larceny.

[4] The state court petition did allege a cause of action under the Texas Deceptive Trade Practices Act.

8. Further, no trial record from the state court litigation was tendered to this Court.

9. Since no factual findings were issued in conjunction with the State Court Default Judgment nor any trial record from that litigation was tendered to this Court from which the principles of issue preclusion could apply, the parties presented evidence to this Court at trial regarding the circumstances under which the various components of the indebtedness occurred.

10. On or about June 26, 2006, Plaintiff and Defendant entered into a Residential Buyer/Tenant Representation Agreement by which the Defendant became the real estate agent for Plaintiff for the purchase of a home.[5]

11. On or about July 8, 2006, the Plaintiff entered into a KB Home Purchase Agreement with KB Home Lone Star for the purchase of the home located at 2016 Spotted Court, in Plano, Texas. (the "Home").[6]

12. The Plaintiff procured financing for the purchase of the Home from Countrywide KB Home Loans ("Countrywide").

13. A portion of that financing was intended to be utilized for certain post-closing improvements to the property, including electrical, concrete, flooring and painting services that were to be rendered.

14. The Plaintiff proceeded to procure the services of certain subcontractors to do the specified improvements.

15. A couple of weeks prior to the closing of the sales transaction, the Plaintiff learned that Countrywide would not tender the funds for the improvements directly to him, but rather would require the involvement of a third-party "general contractor" to whom its funds could be entrusted pending verification of the completion of the designated improvements upon the Home and the general contractor would be responsible to pay all other contractors, laborers or service providers.

16. Without the designation and approval of such a "general contractor," there was a significant likelihood that the closing of the sales transaction on the Home would be delayed.

---

[5] See ¶ 5 of the Stipulated "Agreed Facts" set forth in the approved Joint Pre-Trial Order entered in this adversary proceeding on November 12, 2013 [dkt #14].

[6] Ex. 1.

17. The Plaintiff greatly desired to avoid any such delay.

18. The Defendant was also motivated to achieve closing of the sales transaction since her real estate commission was dependent upon it.

19. The Defendant ultimately agreed with the Plaintiff that her company known as "The In Group, LLC" would serve as the general contractor for the post-closing improvements.

20. The Plaintiff was not fraudulently induced to select the Defendant's company as the general contractor through any false representation or false pretense of the Defendant regarding her company or her supposed expertise as a contractor.

21. The Plaintiff sought to achieve closing of the sales transaction and the funding of the post-closing improvements in the most expedient manner possible and he designated the Defendant's company to serve as the general contractor only in a nominal sense.

22. There is certainly a possibility, perhaps a probability, that the Defendant was, at this stage, a willing participant in this plan to gain access to the additional improvement funds in order to facilitate the closing of the sales transaction.

23. The Plaintiff's selection of the Defendant's company as the nominal general contractor over the improvements project was not procured as a result of, nor induced by, the status of whether the Defendant's company had forfeited its business privileges within the State of Texas for failure to pay required fees.

24. The Plaintiff's selection of the Defendant's company as the nominal general contractor over the improvements project was not procured as a result of, nor induced by, any statement or representation of the Defendant with regard to her experience as a general contractor.

25. On or about February 12, 2007, the Plaintiff and the Defendant executed a "Contract for Improvements" (the "Improvement Contract") which made the Defendant's company, The In Group, responsible for the completion of all of the designated improvements.[7]

---

[7] Ex. 4. Though the exhibit tendered is actually an unsigned copy, the parties stipulate that this is the agreement which was signed between them.

26. The language of the Improvement Contract does not explicitly identify a precise fee for the general contractor. The sole reference contained in the document (fees "incl.") is that the stated aggregate contract price includes all fees.

27. Without the execution of the contract that procured the services of a general contractor acceptable to Countrywide for the post-closing improvements, the sales transaction would not have closed as scheduled and the escrow amounts would not have been tendered by Countrywide.

28. Notwithstanding the language of the Improvement Contract, the Plaintiff expected the Defendant to serve merely as a conduit by which to access the escrowed funds — an accommodation service for which the Plaintiff expected the Defendant to forego any fee.

29. The designation of the Defendant's company as the "general contractor" was submitted by the Plaintiff to Countrywide.

30. The Plaintiff's selection of the Defendant's company to serve as the "general contractor" for the post-closing improvements was approved by Countrywide.

31. Any deception arising from these circumstances was imposed solely upon Countrywide, and not upon the Plaintiff.

32. On February 13, 2007, the Plaintiff and Countrywide executed an "Escrow Agreement for Postponed Exterior Improvements" (the "Escrow Agreement") that estimated the cost of the anticipated improvements at $20,034.61.[8]

33. The Escrow Agreement between the Plaintiff and Countrywide further designated that the escrowed funds would be held by Countrywide and disbursed only upon its approval.[9]

34. The closing of the sale of the Home occurred on February 16, 2007.

35. The sum of $20,034.61 was escrowed with the title company, First American Title

---

[8] Ex. 2.

[9] *Id.* The Escrow Agreement clearly and consistently placed the escrowed funds within the exclusive control of Countrywide. Accordingly, the Agreement provides that no party, including the Plaintiff, would be entitled to any accrual of interest so long as the funds remained in escrow.

        Insurance Company, for the purpose of financing the post-closing improvements on the Home pursuant to the designated escrow procedures.[10]

36. Once the sales transaction had closed and the escrow was funded, and notwithstanding his execution of the Improvement Contract and the Escrow Agreement, the Plaintiff expected in the post-closing period to proceed with his supervision of, and payment for, the improvements upon his newly-acquired Home as he had previously arranged, while abiding by the terms of those contracts only to the degree necessary to obtain the money from the $20,034.61 Countrywide escrow fund.

37. Because of his prior activity with subcontractors, and notwithstanding the language of the Improvement Contract, the Plaintiff did not anticipate the active participation of the Defendant in the improvement project.

38. Notwithstanding the language of the Improvement Contract, the Plaintiff expected the Defendant to serve as a non-participating conduit to the Countrywide escrow fund who would pay his selected subcontractors at his sole direction and discretion.

39. Though most of the Plaintiff's pre-selected subcontractors were utilized in the improvement project, the Defendant did actually recommend to the Plaintiff an electrician for the project which the Plaintiff accepted and utilized.

40. Through circumstances that might be considered questionable from Countrywide's perspective but which are not germane to this dispute between these parties, the Defendant obtained possession of $18,360.27 from the $20,034.61 Countrywide escrow fund.

41. Upon her receipt of such funds, the Plaintiff demanded that the Defendant forward the escrow proceeds directly to him, rather than to the designated subcontractors. The Defendant refused to comply.

42. From the $18,360.27 received by her, the Defendant made the following disbursements:

---

[10] Ex. 3.

        $1,850.00 paid to painting subcontractor;
        $1,600.00 paid to electrical subcontractor;
        $6,410.27 paid to her company for general contracting services.[11]

43.    For reasons unexplained in the record, she returned the remaining sum of $8,500.00 to Countrywide and ended her service relationship with the Plaintiff.[12]

44.    Subsequently, Countrywide agreed to forward funds directly to the Plaintiff and the Plaintiff distributed an additional $10,174.34 to subcontractors to complete the improvement project.[13]

45.    Thus, based upon the evidence presented, a total of $13,624.34 was paid to subcontractors procured by the Plaintiff for the improvement project.

46.    When cross-examined, the Plaintiff provided no explanation as to why his Escrow Agreement with Countrywide funded the escrow with the amount of $20,034.61 when the aggregate of the contract amounts he negotiated with, and ultimately paid to, the various subcontractors for work on the Home totaled only $13,624.34.

47.    The Plaintiff has failed to demonstrate by a preponderance of the evidence that the Improvement Contract did not authorize the payment of a fee to the Defendant.

48.    The Plaintiff has failed to demonstrate by a preponderance of the evidence that the financial circumstances surrounding the improvement project precluded the payment of a fee to the designated general contractor, in light of the aggregate contract amounts he negotiated with, and ultimately paid to, the various subcontractors for work on the improvement project.

49.    The Plaintiff has failed to demonstrate by a preponderance of the evidence that the parties did not contemplate the payment of a fee for general contractor services under the Improvement Contract, particularly in light of the existence of funds in the Countrywide escrow fund that were far in excess of those needed to complete the improvement project.

---

[11] Ex. 17.

[12] *Id.*

[13] *Id.* Though the Plaintiff testified that he had earlier advanced certain funds to subcontractors while awaiting distributions from the Countrywide escrow fund, no proof was presented at trial to corroborate those claims.

50. While one might legitimately question whether the compensation retained by the Defendant was excessive in a quantum meruit sense, the Plaintiff has failed to demonstrate by a preponderance of the evidence that the Defendant's retention of the $6,410.27 was procured through false pretenses or a false representation made to him regarding a material fact.

51. The Plaintiff has failed to demonstrate by a preponderance of the evidence that the Defendant made false representations to the Plaintiff regarding a material fact with the intention and purpose of deceiving the Plaintiff.

52. The Plaintiff has failed to demonstrate by a preponderance of the evidence that he justifiably relied upon any false representation by the Defendant with regard to any material fact.

53. The Plaintiff has failed to demonstrate by a preponderance of the evidence that the Defendant acted in a fiduciary capacity as to the Plaintiff at any time.

54. The Plaintiff has failed to demonstrate by a preponderance of the evidence that a trust relationship existed between the Defendant and himself prior to the creation of the indebtedness in question.

55. The Plaintiff has failed to demonstrate by a preponderance of the evidence that the Defendant committed a defalcation while acting in a fiduciary capacity.

56. The Plaintiff has failed to demonstrate by a preponderance of the evidence that the Defendant appropriated any funds from the Plaintiff with a fraudulent intent.

57. The Plaintiff has failed to demonstrate by a preponderance of the evidence that any amount otherwise owing to the Plaintiff by the Defendant under the State Court Default Judgment arose under circumstances that render such debt nondischargeable under the Bankruptcy Code.

58. To the extent any of these findings of fact constitute conclusions of law, the Court expressly adopts them as such.

# CONCLUSIONS OF LAW

1. This Court has subject matter jurisdiction under 28 U.S.C. §§1334 and 11 U.S.C. §523. This Court has personal jurisdiction over the parties to this adversary proceeding.

2. This Court has authority to enter a final judgment in this adversary proceeding since it statutorily constitutes a core proceeding as contemplated by 28 U.S.C. §157(b)(2)(I) and (O) and meets all constitutional standards for the proper exercise of full judicial power by this Court.

3. In seeking to except the debt owed to them from the scope of the Debtor-Defendant's discharge, the Plaintiff assumes the burden of proof under a preponderance of the evidence standard. *Grogan v. Garner*, 498 U.S. 279, 286 (1991).

4. "Intertwined with this burden is the basic principle of bankruptcy that exceptions to discharge must be strictly construed against a creditor and liberally construed in favor of a debtor so that the debtor may be afforded a fresh start." *FNFS, Ltd. v. Harwood (In re Harwood)*, 637 F.3d 615, 619 (5th Cir. 2011) (citing *Hudson v. Raggio & Raggio, Inc. (In re Hudson)),* 107 F.3d 355, 356 (5th Cir. 1997).

5. The fact that there is a debt owing by the Defendant to the Plaintiff is established through the State Court Default Judgment. However, this Court retains exclusive jurisdiction to determine whether that debt is dischargeable. *Grogan v. Garner*, 498 U.S. 279, 285, n.11, (1991); *Fielder v. King (Matter of King),* 103 F.3d 17, 19 (5th Cir. 1997).

*Nondischargeability Under 523(a)(2)(A): Debt Arising by Fraud, False Pretenses, or False Representation.*

6. The Plaintiff's Complaint seeks a determination that the debt owed to him under the State Court Default Judgment should be excepted from discharge under §523(a)(2)(A) as a debt obtained by false pretenses, a false representation or actual fraud.

7. 11 U.S.C. §523(a)(2)(A) of the Bankruptcy Code provides that:

> a discharge under §727 of this title does not discharge an individual debtor from any debt for money, property, or

       services, . . . to the extent obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

8. Section 523(a)(2)(A) encompasses similar but distinct causes of action. Though other circuits have applied a uniform standard to all § 523(a)(2)(A) actions,[14] the Fifth Circuit has distinguished the elements of "actual fraud" and of "false pretenses and false representations." *RecoverEdge L.P. v. Pentecost*, 44 F.3d 1284, 1291 (5th Cir. 1995).

9. The distinction recognized by the Fifth Circuit appears to be a chronological one, resting upon whether a debtor's representation is made with reference to a future event, as opposed to a representation regarding a past or existing fact. *Bank of La. v. Bercier (In re Bercier)*, 934 F.2d 689, 692 (5th Cir.1991) [A debtor's promise . . . related to a future action which does not purport to depict current or past fact . . . therefore cannot be defined as a false representation or a false pretense].

10. Because the alleged representations by the Defendant regarding her company and her expertise as a general contractor regarded a past or existing fact, any such statement cannot be properly characterized as actual fraud in this Circuit.

11. Thus, the validity of the Plaintiff's claim under §523(a)(2)(A) in this case rests upon sufficient proof that the debt was obtained by a false representation or under false pretenses.

12. While "false pretenses" and a "false representation" both involve intentional conduct intended to create and foster a false impression, the distinction is that a false representation involves an express statement, while a claim of false pretenses

---

[14] *See, e.g., Britton v. Price (In re Britton)*, 950 F.2d 602, 604 (9th Cir. 1991); *Caspers v. Van Horne (In re Van Horne)*, 823 F.2d 1285, 1287 (8th Cir. 1987). Though some bankruptcy courts outside of the Fifth Circuit have cited the decision of the United States Supreme Court in *Field v. Mans*, 516 U.S. 59, 116 S.Ct. 437, 133 L.Ed.2d 351(1995), in support of their proposition that all of the §523(a)(2)(A) actions are governed by the elements for actual fraud, *see, e.g., AT&T Universal Card Services v. Ellingsworth (In re Ellingsworth)*, 212 B.R. 326 (Bankr. W.D. Mo. 1997); *AT& T Universal Card Services v. Alvi (In re Alvi),* 191 B.R. 724 (Bankr. N.D. Ill. 1996); the Supreme Court in that case was actually distinguishing the language used in §523(a)(2)(A) from that utilized in §523(a)(2)(B) in order to determine the degree of reliance necessary above mere reliance in fact in order to exempt a debt from discharge under (a)(2)(A). Since the Supreme Court specifically refused to even apply their direct holding regarding the degree of reliance in actual fraud cases to cases of false pretense or false representation, 116 S.Ct. at 443, n. 8, the statement that the Court erased all distinctions between the three (a)(2)(A) actions strains credibility.

may be premised on misleading conduct without an explicit statement. *See Walker v. Davis (In re Davis),* 377 B.R. 827, 834 (Bankr. E.D. Tex. 2007); and *Haney v. Copeland (In re Copeland)*, 291 B.R. 740, 760 (Bankr. E.D. Tenn. 2003).

13. "In order for the court to deny discharge of a debt under section 523(a)(2)(A) on the basis that the debt was procured by false pretenses or a false representation, the plaintiff must prove by a preponderance of the evidence that the debtor made representations that were (1) knowing and fraudulent falsehoods, (2) describing past or current facts, (3) that were relied upon by the other party." *Mosiman v Warren (In re Warren)*, 2010 WL 2640267, at *2 (Bankr. N.D. Tex., June 29, 2010) (*citing Allison v. Roberts (In re Allison)*, 960 F.2d 481, 483 (5th Cir. 1992).[15]

14. In evaluating whether a party could justifiably rely upon any allegedly false pretense or false representation, such statement or silence is "material" when, in deciding on course of action, a reasonable man would attach importance to its existence, or when party making representation knows or has reason to know that its recipient regards, or is likely to regard, matter as important, although reasonable man would not so regard it. *AT&T Universal Card Svcs. v. Mercer (In re Mercer)*, 246 F.3d 391,416 (5th Cir. 2001) (citing RESTATEMENT (SECOND) OF TORTS §538(2) (1977)).

15. A knowing and fraudulent falsehood may also arise by nondisclosure when a party with a duty to disclose material facts fails to do so. *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 181 (Tex.1997); cited in *Cronus Offshore, Inc. v. Kerr McGee Oil & Gas Corp*., 369 F.Supp.2d 848, 858 (E.D. Tex. 2004).

16. The existence of such silence when there is a duty to speak may equate to a misrepresentation of material facts. *Spoljaric v. Percival Tours, Inc*., 708 S.W.2d 432, 435 (Tex.1986); *Ho v. UT Arlington*, 984 S.W.2d 672, 691 (Tex. App. – Amarillo 1998, pet. denied).

---

[15] A debt may also be declared nondischargeable if it was obtained by actual fraud. To have a debt excepted from discharge pursuant to the "actual fraud" provision in § 523(a)(2)(A), an objecting creditor must prove that (1) the debtor made representations; (2) at the time they were made the debtor knew they were false; (3) the debtor made the representations with the intention and purpose to deceive the creditor; (4) the creditor justifiably relied on such representation; and (5) the creditor sustained losses as a proximate result of the representations. *RecoverEdge L.P. v. Pentecost*, 44 F.3d 1284, 1293 (5th Cir. 1995), *as modified by the United States Supreme Court decision of Field v. Mans*, 516 U.S. 59 (1995) [regarding the proper standard of reliance].

17. The failure to disclose a material fact when one has a duty to do so is sufficient to establish non-dischargeability for fraud under § 523(a)(2)(A). *Kleindienst v. Horne (In re Horne)*, 2011 WL 350473 at *7 (Bankr. W.D. Tex., Feb. 2, 2011); *Int'l Beauty Products, L.L.C. v. Beveridge (In re Beveridge),* 416 B.R. 552, 569-70 (Bankr. N.D. Tex. 2009); and cases cited therein.

18. Because the Court concludes that the Plaintiff has failed to prove by a preponderance of the evidence that any amount encompassed by the State Court Default Judgment was obtained through false pretenses or by a false representation, judgment must be rendered for the Debtor-Defendant under §523(a)(2)(A).

*Nondischargeability Under §523(a)(4):*
*Debt Arising from Fraud or Defalcation*
*in a Fiduciary Capacity, Embezzlement or Larceny.*

19. 11 U.S.C. §523(a)(4) provides that "A discharge under 11 U.S.C.§ 727 does not discharge an individual from a debt for fraud or defalcation while acting in a fiduciary capacity, embezzlement or larceny."

20. The Fifth Circuit has noted "that this discharge exception was intended to reach those debts incurred through abuses of fiduciary positions and through active misconduct whereby a debtor has deprived others of their property by criminal acts; both classes of conduct involve debts arising from the debtor's acquisition or use of property that is not the debtor's." *Miller v. J.D. Abrams Inc. (Matter of Miller),* 156 F.3d 598, 602 (5th Cir.1998), *cert. denied*, 526 U.S. 1016 (1999) (internal quotations omitted).

21. Whether the actions of an individual were taken in a fiduciary capacity for the purposes of §523(a)(4) is determined by federal law. *FNFS, Ltd. v. Harwood (In re Harwood)*, 637 F.3d 615, 620 (5th Cir. 2011).

22. However, "state law is important in determining whether or not a trust obligation exists." *Gupta v. Eastern Idaho Tumor Institute, Inc. (In re Gupta)*, 394 F.3d 347, 350 (5th Cir. 2004).

23. The Fifth Circuit has discussed the concept of a fiduciary under §523(a)(4) in the following terms:

> [T]he concept of fiduciary under §523(a)(4) is narrower than it is under general common law. Under §523(a)(4), "fiduciary" is limited to instances involving express or technical trusts. The purported trustee's duties must, therefore, arise independent of any contractual obligation. The trustee's obligations, moreover, must have been imposed prior to, rather than by virtue of, any claimed misappropriation or wrong. Constructive trusts or trusts *ex malificio* thus also fall short of the requirements of §523(a)(4).
>
> . . . Statutory trusts, by contrast, can satisfy the dictates of §523(a)(4). It is not enough, however, that a statute purports to create a trust: A state cannot magically transform ordinary agents, contractors, or sellers into fiduciaries by the simple incantation of the terms "trust" or "fiduciary." Rather, to meet the requirements of §523(a)(4), a statutory trust must (1) include a definable res and (2) impose "trust-like" duties.

*Texas Lottery Comm'n v. Tran (In re Tran),* 151 F.3d 339, 342-43 (5th Cir. 1998).

24. However, the trust relationship must exist prior to the creation of, and without reference to, the indebtedness in question. *Angelle v. Reed (In re Angelle)*, 610 F.2d 1335, 1338 (5th Cir. 1980).

25. The Fifth Circuit has recognized that the "technical" or "express" trust requirement is not limited to trusts that arise by virtue of a formal trust agreement, but includes relationships in which trust-type obligations are imposed pursuant to statute or common law. *FNFS, Ltd. v. Harwood (In re Harwood)*, 404 B.R. 366, 393 (Bankr. E.D. Tex. 2009) (citing *LSP Inv. Partnership v. Bennett (In re Bennett)*, 898 F.2d 779, 784-85 (5th Cir.), *cert. denied*, 510 U.S. 1011 (1993)).

26. Federal courts in this context have "not hesitated to conclude that debts arising from misappropriation by persons serving in a traditional, pre-existing fiduciary capacity, as understood by state law principles, are non-dischargeable." *Shcolnik v. Rapid Settlements, Ltd. (In re Shcolnik)*, 670 F.3d 624, 628 (5th Cir. 2012) (citing *Gupta*, 394 F.3d at 350).

27. The sole basis upon which the Plaintiff alleges the existence of a trust relationship with the Defendant is through the statutory imposition of a trust relationship under

the Texas Construction Trust Fund Act. TEX. PROP. CODE §162.001 et. seq.[16]

28. However, in 2006 and 2007, when the vast majority of the relevant facts to this dispute occurred, the sole beneficiaries of the Texas Construction Trust Fund Act were the unpaid laborers and materialmen supplying services under a construction contract – but not the owner of real property who supplied the funds to the contractor. *Karbach v. Markham*, 2009 WL 3682604 (Tex. App. – Austin, Nov. 6, 2009, no pet.); *Lampman v. Lee (In re Lee)*, 230 B.R. 810, 813 (Bankr. N.D. Tex. 1999).

29. While the statute was subsequently amended to make a property owner a beneficiary of those protections,[17] the creation of that new fiduciary status did not become effective as to a residential property owner until September 1, 2009.[18]

30. Thus, at the time of the contractual relationship between the Plaintiff and the Defendant, the Defendant did not stand in a fiduciary relationship to the Plaintiff that is sufficient to meet the fiduciary capacity requirement under 11 U.S.C. §523(a)(4).

31. Because the Court concludes that the Plaintiff Valis Houston, has failed to demonstrate by a preponderance of the evidence that any amount encompassed by the State Court Default Judgment arose while the Defendant, DeLisa Cravanas, was acting in a fiduciary capacity as to him, judgment must be rendered for the Defendant on the §523(a)(4) claim.

32. To the extent any of these conclusions of law constitute findings of fact, the Court expressly adopts them as such.

---

[16] Actually the Pre-Trial Order only ambiguously references allegations that "defendant acted as a fiduciary for plaintiff's funds; that defendant obtained plaintiff's funds to pay subcontractors but converted those funds for herself; all of which constitutes a violation of 11 U.S.C. Section 523(a)(4)." See ¶ 3 of the approved Joint Pre-Trial Order entered in this adversary proceeding on November 12, 2013 [dkt #14].

[17] Section 162.003(b) of the Texas Property Code now states:

> (b) A property owner is a beneficiary of trust funds described in Section 162.001 in connection with a residential construction contract, including funds deposited into a construction account described by Section 162.006.

[18] *See* 5 TEX. PROP. CODE ANN. §162.003 (Vernon Supp. 2013).

*CONCLUSION*

33. Because the Plaintiff, Valis Houston, has failed to demonstrate by a preponderance of the evidence that any amount otherwise owing to him by the Defendant, Delise C. Cravanas, under the State Court Default Judgment should be rendered nondischargeable under either §523(a)(2)(A) or §523(a)(4) of the Bankruptcy Code, all relief requested in the Plaintiff's Complaint must be denied and judgment rendered for the Defendant.

34. An appropriate judgment shall be entered consistent with these findings and conclusions.

Signed on 01/29/2014

THE HONORABLE BILL PARKER
UNITED STATES BANKRUPTCY JUDGE